# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN DOE,
  *Plaintiff*,
    v.

No. 3:15-cv-00160 (VAB)

THE HOTCHKISS SCHOOL,
  *Defendant.*

## RULING AND ORDER ON MOTION IN LIMINE AND LEAVE TO ADD WITNESS

John Doe ("Plaintiff") has sued The Hotchkiss School ("Hotchkiss" or "Defendant") for, among other things, negligence and fraudulent concealment of severe sexual abuse.

Hotchkiss seeks to prohibit Anthony Charuvastra MD ("Dr. Charuvastra") from testifying as an expert at trial.

Mr. Doe, in turn, seeks leave to allow Charol Shakeshaft, Ph.D. ("Dr. Shakeshaft") to testify as an expert at trial.

For the reasons that follow, the Court **DENIES** Hotchkiss' motion to prohibit Dr. Charuvastra from testifying as an expert at trial without prejudice to renewal at trial. The Court also **DENIES** Mr. Doe's motion for leave to add Dr. Shakeshaft as an expert witness at trial without prejudice to Mr. Doe calling Dr. Shakeshaft as a rebuttal witness, after Hotchkiss presents its case.

## I.    FACTUAL AND PROCEDURAL HISTORY

### A. Factual Background

On February 5, 2015, Mr. Doe filed his Complaint, alleging that when Mr. Doe enrolled at Hotchkiss at fourteen he "entered an environment of well-known and tolerated sexual assaults, sexually violent hazing, and pedophilia." ECF No. 1. He alleges that upper classmen, "including

school-appointed senior dormitory proctors," assaulted him on multiple occasions. *Id.* He further alleges that a teacher sexually abused, drugged, and raped him. *Id.*

When Mr. Doe allegedly attended the school, "The Hotchkiss School charged many thousands of dollars per year for the privilege of attending the school and residing in a dormitory on school grounds" where "Hotchkiss assumed responsibility form, among other things, students' protection, safety and well-being." *Id.* at ¶¶ 9,10. The school allegedly "accepted a duty to John and to other minor children in its care and custody to do everything within its power to protect them from sexual abuse by other students and by the school's faculty," even while "the school and administrators knew that there was a history and tradition at the school of older male students . . . subjecting younger students to sexual hazing." *Id.* at ¶¶ 12, 14.

This was allegedly "not disclosed to John at any time prior to his arrival at the school," and the "school and its teachers and administrators permitted and condoned the tradition of hazing, and they allowed sexual assaults to occur without punishment and without even a meaningful threat of punishment." *Id.* at ¶¶ 15, 16.

The Complaint further alleges several sexual assaults by other students and a muted response by faculty and staff. *Id.* at ¶¶ 17–24. Then, the Complaint details sexual assault allegations against a teacher and dormitory master that Mr. Doe alleges Hotchkiss knew or should have known about. *Id.* at ¶¶ 25–45. Mr. Doe alleges that "the school created a situation that it knew and should have known was likely to be dangerous to John and to other young children in its care," but "the school refused to take appropriate precautions against the risk of harm." *Id.* at ¶¶ 46–47.

After allegedly suffering sexual abuse at the hands of other students and a teacher, Mr. Doe allegedly reported the incidents to teachers, staff, and administrators that "took no steps to

protect John and other vulnerable children from further assaults." *Id.* at ¶¶ 49–57. Mr. Doe alleges that the trauma suffered at Hotchkiss School limits his "ability to engage in normal . . . activities," "has adversely affected his ability to enter into and maintain lasting meaningful relationships," irreparably damaged his "ability to maintain intimate physical, sexual and emotional relationships," and caused "physical pain and suffering," *Id.* at ¶¶58–62.

### 1. Dr. Charuvastra's Report

On January 20, 2017, Plaintiff designated Dr. Anthony Charuvastra and served his report to Hotchkiss. *See* Forensic Psychiatric Evaluation Report, Ex. A ("Ex. A."), ECF No. 212-1. Mr. Doe, through a referral by his former attorney Arick Fudall, requested a consultation by Dr. Charuvastra. Ex. A, at 2. To prepare for Mr. Doe's interview, Dr. Charuvastra reviewed the Complaint filed February 5, 2015, John Doe's medical records from Hotchkiss School, John Doe's school records from 1985–87, and a transcript of John Doe's November 18, 2016 deposition. *Id.* at 1. On January 8, 2017, Dr. Charuvastra conducted an interview of John Doe. *Id.*

On January 20, 2017, Dr. Charuvastra finalized a report that included a mental status exam, an overview of Mr. Doe's medical and social history, a narrative history of Mr. Doe's psychiatric symptoms, Mr. Doe's post-traumatic stress disorder test results, Mr. Doe's case and diagnostic summaries, and treatment recommendations. *See generally id.* Dr. Charuvastra concluded that "the cause of [Mr. Doe's] PTSD [Post-Traumatic Stress Disorder] is the abuse and assault that he endured while at Hotchkiss." *Id.* at 11. Dr. Charuvastra based this conclusion on the consistency of his accounts between the deposition and Dr. Charuvastra's interview, Mr. Doe's lack of traumatic history, and the onset of Mr. Doe's chronic symptoms while at Hotchkiss. *Id.* Dr. Charuvastra concluded that Mr. Doe's subjective description and clinical

presentation in the interview were consistent with "actual PTSD related to sexual assault an abuse that occurred during his adolescence." *Id.* at 12.

### 2. Dr. Shakeshaft's Proposed Expert Testimony

According to the Court's Scheduling Order, Mr. Doe needed to designate his experts on or before January 20, 2017. ECF No. 54. After Mr. Doe retained his current counsel, the parties jointly moved for a modified scheduling order. Joint Proposed Scheduling Order, ECF No. 142. The parties, however, disagreed about whether Mr. Doe should be allowed to disclose new experts. *See id.* at 1–2. The Court concluded that "Mr. Doe has not shown sufficient compelling cause to justify granting leave to designate additional experts after the deadline for such disclosures" and chose not to give more time for Mr. Doe to show expert testimony. Scheduling Order, ECF No. 144.

Since the Court issued the scheduling order, Hotchkiss released a report detailing rampant sexual abuse during the 1970s and 1980s by multiple former faculty members. Report to Board of Trustees of the Hotchkiss School, Exhibit G ("Ex. G"), ECF No. 228-1. The internal report concluded that Hotchkiss missed "key opportunities to protect the student body." *Id.* at 26.

Before publication of the internal investigation, Mr. Doe's counsel commissioned a report by Dr. Shakeshaft. Memorandum of Law in Support of Plaintiff's Mot. for Leave to Add an Expert to Testify, ECF No. 228-1, at 5. Dr. Shakeshaft, an educational institution researcher and former chair of the Educational Leadership Department at Virginia Commonwealth University, has co-authored a four-year study on sexual abuse at schools, and is "noted for her studies on sexual abuse of students by school staff." *Id.* To prepare her report, Dr. Shakeshaft reviewed the Complaint, deposition transcript, and dozens of documents related to the case. Report Doe v. The Hotchkiss School, Exhibit C ("Ex. C"), ECF No. 228-5, at 2–3.

Dr. Shakeshaft determined that Hotchkiss had no documented policies to prevent peer-to-peer sexual abuse or sexual abuse by teachers, administrators, employees, volunteers, or visitors. Ex. C, at 35. To prevent peer-to-peer sexual abuse, Dr. Shakeshaft suggested that Hotchkiss should have instituted policies concerning bullying, hazing, and intimidation in the student code of conduct. *Id.* Although Hotchkiss changed the student handbook for the 1986–87 school year to impose disciplinary action for hazing, bullying, or baiting, Dr. Shakeshaft found those policies to be unenforced. *Id.* She concluded that enforcing the student conduct provisions would have reduced the health risk to students. For adults, Hotchkiss should have followed the State of Connecticut's mandatory reporting laws for educators, laws in place since 1967, which would have included training on sexual abuse and systems of investigation, grievances, and consequences for adults. *Id.*

Dr. Shakeshaft further opined that Hotchkiss gave no training to employees, parents, or students about proper boundaries or mandatory reporting. *Id.* at 39. This lack of training included: no training on ethical issues with students; no training for employees in the athletic departments on appropriate touching; no training on sexual boundaries with students or reporting; and no training on bullying, hazing, or intimidation. *Id.* Dr. Shakeshaft concluded that training in those areas could have lowered potential risks to students.

Dr. Shakeshaft also opined that Hotchkiss made no effort to report possible sexual misconduct to law enforcement or child services. *Id.* at 43. Moreover, Hotchkiss did not make efforts to record or investigate allegations of sexual abuse, which put students at a significantly increased risk of further abuse. *Id.*

Finally, Dr. Shakeshaft did not find a system for supervising faculty or increased supervision when faculty, administration, or students observed suspicious activity. *Id.* at 45. She

concluded that any response by Hotchkiss could have changed behaviors and reduced the risk of future sexual abuse, *id.*, and the lack of supervision in the dorms increased the likelihood of peer-to-peer sexual abuse, hazing, bullying, and intimidation. *Id.* at 46.

**B.      Procedural History**

On February 5, 2015, Mr. Doe filed a Complaint against Hotchkiss for negligence, recklessness, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of fiduciary duty. ECF No. 1.

On April 10, 2015, the parties jointly filed a Rule 26(f) Report. ECF No. 17.

On May 18, 2015, the Court granted a stay until the Connecticut Supreme Court resolved *Doe v. The Hartford Roman Catholic Diocesan Corporation*. ECF No. 22. On July 2, 2015, the Court lifted the Stay. ECF No. 25.

On July 8, 2015, the parties jointly filed a supplemental Rule 26(f) Report. ECF No. 26. On July 21, 2015, the Court approved an amended report the same day. ECF Nos. 28, 29.

On September 14, 2015, Hotchkiss answered the Complaint with affirmative defenses.

On April 18, 2016, the Court granted Attorney Antonio Ponvert's motion to withdraw as attorney for John Doe. ECF Nos. 40, 41.

On June 1, 2016, Hotchkiss moved to stay, which the Court denied. ECF Nos. 47, 50.

On July 15, 2016, the parties jointly filed a supplemental Rule 26(f) Report. ECF No. 51. On July 27, 2016, the Court held a telephonic status conference and issued a scheduling order with modified deadlines. ECF Nos. 53, 54. The deadline included a deadline for Plaintiff to designate experts and provide any designated experts' report by January 20, 2017.

On December 9, 2016, Hotchkiss moved to compel discovery responses. ECF No. 57. On December 12, 2016, the Court denied the motion to compel without prejudice to renewal if the parties did not resolve the discovery dispute after a telephonic conference. ECF No. 61.

On January 23, 2017, the parties jointly moved for a discovery conference, which the Court granted. ECF Nos. 63, 64. On January 31, 2017, the Court held a telephonic discovery dispute conference. ECF No. 70.

On March 17, 2017, the parties jointly moved for a discovery conference, which the Court granted. ECF Nos. 73, 74.

On March 28, 2017, the Court held another telephonic discovery dispute status conference and issued an order requiring Defendants to produce items designated by the Plaintiff. ECF No. 78.

On May 11, 2017, the parties jointly stipulated to Hotchkiss' motion for independent medical examination, which the Court granted. ECF Nos. 85, 86.

On June 22, 2017, Hotchkiss moved for conference, which the Court granted. ECF Nos. 99, 100. On July 5, 2017, the Court held a telephonic discovery dispute conference where Plaintiff's counsel informed the Court hat counsel intended to withdraw from the case immediately, even though depositions were scheduled for the following day. ECF No. 104.

The Court then issued an Order to Show Cause and requested that Plaintiff Doe appear with counsel at an *ex parte* proceeding by telephone and show cause why Plaintiff's counsel should not remain until after the deposition scheduled for tomorrow has concluded or, in the alternative, why Plaintiff should not be required to pay the costs incurred by Defendant, if the deposition cannot go forward. ECF No. 105.

On July 5, 2017, the Court held a telephonic show cause hearing. ECF No. 106. Based on the representations of Plaintiff and Plaintiff's counsel during the *ex parte* telephonic show cause hearing, the Court allowed the withdrawal of Plaintiff's counsel and the July 6, 2017 deposition did not go forward. ECF No. 107.

On July 6, 2017, the Court granted the motion to withdraw Mr. Doe's second set of counsel. ECF No. 113. Considering the issues discussed during the July 5, 2017 show cause hearing, and due to the attorney motions to withdraw as counsel, the Court ordered Plaintiff to appear at an August 11, 2017 telephonic status conference. ECF No. 112. Because of the age of the case, the Court ordered Plaintiff to have new counsel by the August 11, 2017 telephonic conference or proceed *pro se*. *Id.*

The Court cancelled the August 11, 2017 telephonic conference. ECF No. 119. The Court issued an Order to Show Cause as to why the Court should not dismiss the case for failure to prosecute. ECF No. 120. On September 28, 2017, the Court held a show cause hearing. ECF No. 126. On September 29, 2017, the Court issued an Order directing Mr. Doe to appear *pro se*, retain new counsel, or provide a statement to the Court as to why the Court should not dismiss the case for failure to prosecute. ECF No. 129. In November 2017, John Doe hired new counsel. ECF Nos. 133–35, 136–39.

On December 15, 2017, the parties jointly proposed a new scheduling order, which the Court granted in part and denied in part. ECF Nos. 143, 144. The parties' lone dispute was whether the Plaintiff should be permitted to add new experts after the deadline to do so; the Court concluded that Mr. Doe had not shown sufficient good cause to justify granting leave to name additional experts after the deadline for such disclosures and the lack of substantive movement in this case since July 2017 had delayed the case long enough. ECF No. 144. The

Court, however, did extend the deadlines for fact discovery and the close of discovery to May 4, 2018 and June 1, 2018, respectively. *Id.*

On January 29, 2018, the parties jointly stipulated to an independent medical examination. ECF No. 148.

On April 17, 2018, the Court held a telephonic status conference and granted an oral motion to amend the scheduling order. ECF Nos. 160–62.

On May 14, 2018, the parties jointly moved for referral to a magistrate for settlement purposes, which the Court granted. ECF Nos. 178, 179. The Court referred the case to Magistrate Judge Garfinkel for a settlement conference. ECF No. 180.

On May 18, 2018, the parties jointly proposed a scheduling order that the Court adopted. ECF Nos. 184, 188, 189.

On May 25, 2018, Magistrate Judge Garfinkel held a pre-settlement conference. ECF No. 191. On July 3, 2018, Magistrate Judge Garfinkel held a settlement conference where the parties were unable to settle the case. ECF No. 207.

On June 18, 2018, the Court held a telephonic status conference, denying without prejudice Plaintiff's motion for order and granting Hotchkiss' motion for extension of time. ECF No. 198.

On June 22, 2018, the parties jointly moved for a discovery conference. ECF No. 199. On July 24, 2018, the Court held an in-person status conference on discovery disputes. ECF No. 215. The same day, the Court issued an order on the joint motion for discovery conference for Hotchkiss to provide the Court with the disputed documents for *in camera* review. ECF No. 217.

On September 6, 6018, the Court held a post-discovery status conference. ECF No. 235.

On September 11, 2018, the Court held a telephonic status conference regarding two disputed documents the Court reviewed *in camera*, requiring parties to make supplemental filings. ECF No. 239. On October 25, 2018, the Court issued an order regarding the documents reviewed *in camera*. ECF No. 254.

On November 28, 2018, the Court held a hearing regarding pending expert witness motions. ECF No. 267.

## II.    STANDARD OF REVIEW

### A.    Motion in Limine

The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).

The Court will exclude evidence in a motion in limine when it is inadmissible on all potential grounds. *Levinson v. Westport Nat'l Bank*, No. 3:09-cv-1955 (VLB), 2013 WL 3280013, at *3 (D. Conn. June 27, 2013). Courts considering a motion in limine may reserve judgment until trial, so the Court can place the motion in its proper context. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).

### B.    Motion for Leave to Add An Expert Witness

The Supreme Court has recognized that "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 136 S.Ct. 1885, 1892 (2016). Rule 16, however, "was not intended to function as an inflexible straightjacket on the conduct of litigation or to produce an abstract,

perfect equivalence between the pretrial papers and the course of litigation; instead, it was intended to insure the efficient resolution of cases and, most importantly, minimize prejudicial surprise." *Lamborn v. Dittmer*, 873 F.2d 522, 527 (2d Cir. 1989). District courts wield "considerable discretion in the management of trials, and this necessarily 'includes a certain amount of latitude to deviate from the terms of [a] pretrial order.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 249 (2d Cir. 2003) (citing *HBE Leasing Corp. v. Frank*, 22 F.3d 41, 45 (2d Cir. 1994).

## III. DISCUSSION

### A. Motion in Limine

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), courts have a gatekeeping obligation to ensure that expert testimony presented to juries is both reliable and relevant. *Major League Baseball Prop., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (citation omitted); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting that the Court has a "gatekeeping requirement . . . to ensure the reliability and relevancy of expert testimony"); FED. R. EVID. 702 (setting forth the admissibility requirements for expert testimony).

To assure admissibility of expert testimony, courts must consider (1) whether the expert is qualified to opine about the matters on which they offer opinions and (2) whether their testimony will help the trier of fact. See FED. R. EVID. 702; *Daubert*, 509 U.S. at 589-90 (expert must be qualified to give proffered opinion); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (permitting expert testimony only if it "'will assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting FED. R. EVID. 702); *Nimely v. City of N.Y.*, 414 F.3d 381, 396–97 (2d Cir. 2005).

Hotchkiss cites two Eight Circuit decisions to support the argument that expert witnesses "cannot express an opinion that sexual abuse has in fact occurred or vouch for the victim" because it would affect a trial's fairness. *See United States v. Jumping Eagle*, 515 F.3d 794, 800 (8th Cir. 2008); *United States v. Whitted*, 11 F.3d 782, 786 (8th Cir. 1993). Hotchkiss argues that the jury can consider the evidence and decide whether abuse occurred, therefore, expert testimony that abuse occurred merely vouches for plaintiff's credibility and is not useful to the jury. In the expert report, Dr. Charuvastra asserts that Roy Smith abused Mr. Doe, that proctors paddled and sodomized Mr. Doe, and Mr. Doe experienced traumatic events at Hotchkiss. But because his opinion arguably is based solely on Mr. Doe's claims, Hotchkiss argues that this opinion would not be useful to the jury.

Hotchkiss also argues that the expert's opinion is based on insufficient facts and data to form a reliable expert opinion. While Dr. Charuvastra reviewed the Complaint, reviewed Mr. Doe's deposition, and interviewed Mr. Doe to form his opinion, he did not consult any collateral sources on Mr. Doe's mental condition. Hotchkiss alleges that the lack of the accounts from family members, medical providers, or medical records limited the ability of Dr. Charuvastra to evaluate Mr. Doe.

Hotchkiss contends that non-school family trauma, such as loss of a sibling at an early age, estrangement from parents and sister, and a childhood burglary were all relevant to making a complete expert opinion. In its view, the failure to disclose Mr. Doe's education, employment history, or interview his roommate all undermine the validity of his proposed testimony. Because the expert opinion relies solely on an incomplete oral history, and merely accepts Mr. Doe's account as true, Hotchkiss argues that the Court should render the testimony inadmissible under Rule 702.

Finally, Hotchkiss asserts that the expert's reliance on the Clinician Administered Post-Traumatic Stress Disorder Scale does not make the proposed testimony admissible for two reasons. First, the interview questions limit scope of analysis and depend on interviewee response. Without collateral sources, the opinion is based on too little information to support an expert opinion. Second, the traumatic stress scale is notoriously easy to deceive because the interview questions allow interviewees to exaggerate post-traumatic stress. Due to Mr. Doe's interest in this case, the ease with which interviewees can affect results, and the difficulty with detecting the deceptive results, Hotchkiss argues the method gives no objective or independent support for the expert's opinion.

In response, Mr. Doe argues that the proper remedy is not exclusion of the testimony, but supplementation. At the time of the first report, Mr. Doe's deposition was the extent of discovery because Mr. Doe's school records and medical records were inaccessible. Since more records have become available, Mr. Doe's counsel seeks to supplement their initial disclosure under Rule 26(e), which requires that parties make supplemental pre-trial disclosures "at least 30 days before the trial." FED. R. CIV. P. 26(a)(3)(B). Mr. Doe argues that the forthcoming supplementation makes the motion moot.

Alternatively, Mr. Doe argues that even the present expert opinion is admissible because the report is both reliable and relevant to the jury, while not unduly prejudicial to Hotchkiss. Mr. Doe contends that Hotchkiss improperly categorizes the expert opinion about sexual abuse; instead, Dr. Charuvastra opined that Mr. Doe suffered from PTSD. Mr. Doe also argues that the method for diagnosing PTSD satisfies the *Daubert* factors and was based on not just Mr. Doe's statements, but also on the Dr. Charuvastra's many years of experience and training. Because the proposed testimony speaks to the presence of trauma, not whether abuse occurred, allowing the

testimony would not prejudice Hotchkiss. Moreover, the jury will have the ability to gauge Mr. Doe's credibility apart from the expert determination of whether he suffers from trauma.

The Court agrees.

### 1.    Whether Dr. Charuvastra is Qualified to Opine on the Proposed Testimony

The Court must determine whether expert testimony is sufficiently reliable by looking to whether "(1) [ ] the testimony is grounded on sufficient facts or data; (2) [ ] the testimony 'is the produce of reliable principles and methods'; and (3) [ ] 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting FED. R. EVID. 702). The Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

When an expert reliably uses scientific methods to reach a conclusion, any asserted lack of textual support for these methods goes "to the weight, not the admissibility" of his or her testimony. *Amorgianos*, 303 F.3d at 267. A "contrary requirement," the Second Circuit has noted, would "be at odds with the liberal admissibility standards of the federal rules and the express teachings of *Daubert*." *Id.* At the same time, "nothing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A district court's assessment of expert testimony thus needs a case-specific and "rigorous" consideration of the "facts on which the expert relies," the expert's "method," and how he or she "applies the facts and methods to the case at hand." *Id.* at 267.

Here, Dr. Charuvastra's conclusions are based on his January 8, 2017 interview of Mr. Doe and evaluation of the Complaint, along with Mr. Doe's medical records, school records, and deposition transcripts. Ex. A, at 1. When experts rely on certain evidence to support causation, they must provide the Court with a full picture of the state of the field. *See Guardians Assoc. of N.Y.C. Police Dept., Inc. v. Civil Serv. Comm'n.*, 633 F.2d 232, 240 (2d Cir. 1980) ("If the sample is adequate, the data gathering techniques reliable, and the conclusions drawn demonstrated to be statistically significant, such estimates and projections may properly be admitted into evidence"); *K.E. v. GlaxoSmithKline, LLC*, No. 3:14-cv-1294 (VAB), 2017 WL 440242, at *10 (D. Conn. Feb. 1, 2017) (same).

To contextualize his report, Dr. Charuvastra stated that "when I do these interviews, I mean one of the reasons I take so long is that I ask these questions in a very open-ended way where I make every effort to avoid giving him any language to use. And so when he describes— so all the words he uses to describe his experience are words that he—I mean he hasn't heard from me." Charuvastra Depo. 172: 14–20. While Dr. Charuvastra expressed some concern that he had never given an opinion without medical or mental health treatment records, *see id.* at 81:17–22, he also concluded that he thought "the report is effective" even without collateral sources *Id.* at 173: 18–20 ("I mean I think the report is effective. Could it be more effective with more collateral information, yes").

So long as a trauma expert can reliably use a patient interview, legal complaint, and deposition transcript to form a scientific conclusion, any asserted lack of textual support for these methods goes "to the weight, not the admissibility" of their testimony. *See Amorgianos*, 303 F.3d at 267. As a result, in the absence of anything in this record suggesting that it is improper methodologically for Dr. Charuvastra to draw his conclusions, not just imprudent, the Court will

not exclude his testimony. At this stage of the proceedings, however, this is without prejudice to hearing the testimony at trial. *See Nat'l Union Fire Ins.*, 937 F. Supp. at 287 ("the Court will reserve judgment on the motion until trial when admission of particular pieces of evidence is in an appropriate factual context").

### 2. Whether the Dr. Charuvastra's Testimony Will Assist the Trier of Fact

To find that testimony will aid the trier of fact, the Court must review whether the expert will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it." *Nimley*, 414 F.3d at 397 (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). Specifically, the Court cannot allow expert testimony that "'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's.'" *Id.* (citing *United States v. Duncan*, 41 F.3d 97, 101 (2d Cir. 1994)).

Here, neither party questions Dr. Charuvastra's qualifications to opine on psychiatric matters, satisfying the first element. *See GlaxoSmithKline, LLC*, No. 3:14-cv-1294 (VAB), 2017 WL 440242, at *3 ("Expert opinion testimony is permitted only if the witness 'is qualified as an expert by knowledge, skill, experience, training, or education,' and the expert's 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue'") (citing FED. R. EVID. 702). Dr. Charuvastra's opinions are instructive on Mr. Doe's current psychiatric state and prior traumatic experiences. *See* Ex. A, at 11 ("Mr. John Doe currently has PTSD, chronic in nature, of severe intensity").

His conclusions, contrary to Hotchkiss' argument, do not include factual verification of the underlying claims; rather, the conclusions are based on Dr. Charuvastra's January 8, 2017 interview of John Doe and the Complaint, Mr. Doe's medical records, Mr. Doe's school records,

and Mr. Doe's deposition transcripts. *Id.* at 1. Even though Dr. Charuvastra's conclusions are based on Mr. Doe's account of the events, his conclusions do not resolve the underlying legal issues in this case or invade the province of the jury.

At trial, Hotchkiss will be free to raise issues of how much weight the jury should give to Dr. Charuvastra's expert testimony, given the absence of collateral source interviews or his lack of knowledge of other traumatic events in Mr. Doe's life. *See Amorgianos*, 303 F.3d at 267 ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony"). And, as noted above, Hotchkiss will be free to renew any issues about the admissibility of Dr. Charuvastra's testimony at trial, given that the testimony has not been presented in its full context yet. *See Nat'l Union Fire Ins.*, 937 F. Supp. at 287 ("the Court will reserve judgment on the motion until trial when admission of particular pieces of evidence is in an appropriate factual context").

For now, however, Hotchkiss' motion will be denied without prejudice to renewal at trial.

### B.     Motion for Leave to Add Expert Witness

Under FED. R. CIV. P. 16(B)(4), "[a] schedule may be modified only for good cause and with the judge's consent." The Court has "discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2009) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200–01 (2d Cir. 2007)). In doing so, "the lenient standard under Rule 15(a), which provides leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Id.* at

334–35 (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)). The existence of good cause exists turns on the diligence of the moving party. *Id.* at 335.

In determining whether to grant a leave to amend, courts may "consider the following factors: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997); *Caruso v. Bon Secours Charity Health Sys, Inc.*, 703 Fed. App'x 31, 33 (2d Cir. 2017).

Mr. Doe seeks to add the expert testimony of Dr. Shakeshaft to explain "what protocols and policies should have been in place, were in place in other institutions and how those would have created a safer environment for protection of students." *See* ECF No. 228-1, at 12. Mr. Doe seeks to use Dr. Shakeshaft's "technical and specialized opinions concerning education protocols and policies" to "aid the jury in their determination of the facts." *Id.* at 5. Mr. Doe argues that recently discovered information shows that Hotchkiss had a culture of covering up abuse and protecting abusers. *Id.* at 5–8. Mr. Doe contends that Dr. Shakeshaft could shed light on what the school could have and should have done to create a safer environment for students. *Id.* at 12.

In response, Hotchkiss argues that the Court should not change the scheduling order, because under FED. R. CIV. P. 16(b), an order "may be modified only for good cause and with the judge's consent." And that Mr. Doe has not proven good cause for the delay, he has not diligently prosecuted his action, and Hotchkiss' defense would be prejudiced by allowing Mr. Doe to appoint a trial expert more than a year and a half after the deadline to do so.

Hotchkiss argues that because Dr. Shakeshaft is opining on topics central to Mr. Doe's case from its filing, Doe cannot show good cause. For example, Hotchkiss points out that none of

Mr. Doe's recently discovered information about the Locke Lord Report and witness depositions change the underlying factual allegations made in Mr. Doe's Complaint. Finally, Hotchkiss argues that late disclosure of the expert would be prejudicial because Hotchkiss would need to revise its strategy, spend more resources, and engage another expert to rebut Dr. Shakeshaft's testimony.

Mr. Doe further argues that the August 2018 release of Hotchkiss internal investigation by outside counsel show a complicity in rape, sexual assault, and battery of many students, consistent with Dr. Shakeshaft's proposed testimony. Mr. Doe argues that Hotchkiss will have ample time to add its own experts on the issue and rebut Dr. Shakeshaft's testimony. Mr. Doe asserts that, even with reasonable diligence, Mr. Doe could not have discovered the testimony's subject matter by the January 20, 2017 deadline because the information was either undiscoverable or concealed by Hotchkiss.

As of January 2017, for example, neither the Locke Lord Report nor the additional deposition testimony, which Mr. Doe argues show a culture of cover up and retaliation, were available. These recent admissions show good cause for Dr. Shakeshaft's testimony. Moreover, there is no prejudice because minor adjustments to the current scheduling order would accommodate Dr. Shakeshaft and the designation and deposition of any expert appointed by Hotchkiss.

The Court disagrees.

Under *Softel*, a court may consider "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." 118 F.3d at 961. Here, the Court finds that

this testimony is cumulative of other testimony and documentary evidence. The Court therefore chooses not to exercise its discretion to grant Mr. Doe leave to add Dr. Shakeshaft's testimony during his case-in-chief but will reserve ruling on the right to reconsider the introduction of this testimony in the context of rebuttal. *See Dietz*, 136 S.Ct. at 1892 ("district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases").

Mr. Doe justifies the leave to amend based on access to more information. This latest information allegedly "had not been discovered yet and portions were concealed for years by Hotchkiss School." ECF 245, at 3. It was not until the deposition of a former faculty member and release August 2018 Locke Lord Report that "Plaintiff received admissible evidence of an extraordinary culture of cover-up and retaliation perpetrated by Hotchkiss School." *Id.* at 4.

Specifically, Mr. Doe cites deposition testimony from the current Hotchkiss Chief Financial Officer admitting that there were "significant breaches of the School's duties to the students" and "that the school had no training programs or written policies prohibiting sexual contact with students." *See* ECF No. 228-1, at 9. He also "acknowledged that Hotchkiss made no effort to identify the other battered victims of the three student proctors expelled for assaulting, battering, and sodomizing another student." *See id* at 10. Finally, he admits that Hotchkiss failed "to report child sodomy to the police/authorities." *See id.* at 11.

Mr. Doe claims that this knowledge of Hotchkiss's school policy and procedures, information not previously available, inform Dr. Shakeshaft's expert opinion about what "protocols and policies should have been in place, were in place in other institutions and how those would have created a safer environment for protection of students." *Id.* at 12.

Although admissions by current and former Hotchkiss officials are recent, Mr. Doe called into question Hotchkiss' culture and training from the beginning of this case. *See* Compl. ¶ 14 ("the school and its teachers and administrators knew that there was a history and tradition at the school of older male students . . . subjecting younger students to sexualized hazing"), ¶ 46 ("the school created a situation that it knew and should have known was likely to be dangerous to John and to other young children in its care"), ¶ 47 ("the school failed and refused to take appropriate precautions against the risk of harm"), ¶51 ("counselor took no steps to protect John and other vulnerable children from assaults"), ¶ 53 ("advisor took no steps to protect John and other vulnerable children from further assaults"), ¶55 ("The headmaster told John that he was already aware of John's complaints, he took no steps to protect John and other vulnerable children from further assaults"). As a result, to the extent expert testimony was necessary on these issues, Dr. Shakeshaft or someone else could have and should have been disclosed before the expert discovery deadline.

Second, Dr. Shakeshaft's testimony, in large part, if not in its entirety, is cumulative of other likely evidence, such as the Locke Lord Report,[1] and the deposition testimony of Leslie

---

[1] *See, e.g.,* Locke Lord Report, ECF No. 229-9, at 1–2 ("Members of the Hotchkiss administration were aware of at least some of the instances of sexual misconduct at the time it was occurring. What emerges from our investigation is a series of missed opportunities stemming from cultural deficiencies around prioritizing student safety, particularly in the late 1970s through 1980s . . ."), 2 ("a desire on the part of the Hotchkiss community to deal with instances of sexual misconduct internally and a reluctance to involve outside authorities such as the police and the Connecticut Department of Children and Families"), 26 ("it is clear that Hotchkiss missed several key opportunities to protect the student body . . . Looking back on this investigation, it appears that the school inadequately responded to sexual misconduct by faculty members for a variety of reasons . . .").

Stacks,[2] and John Tuke[3] about the alleged failure of Hotchkiss to have proper policies and procedures in place to ensure the safety of its students from sexual abuse.

At this stage of the case, particularly given the various delays in its prosecution, Mr. Doe has failed to show that a jury would need this expert opinion to understand the culture and environment at Hotchkiss when Mr. Doe was there. *See Lumpkin*, 192 F.3d at 289 (allowing expert testimony only if it "'will assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702). Indeed, it is the proper function of the jury to take the admissible facts and documents to make their own conclusions. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) ("The '[e]valuation of ambiguous acts' is a task 'for the jury,' not for the judge on summary judgment").

Third, additional expert testimony may prejudice a party if the action would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a prompt action in another jurisdiction." *See Pasternack v. Shrader*, 863 F.3d 162, 174

---

[2] *See, e.g.*, Stacks Dep. 55: 21–56:2 ("And I told [former Hotchkiss Headmaster Arthur White] very briefly that a student had come to me and has talked to me about being sexually molested by Smokey Robinson. He has photographs that show that, and that also show Smokey with marijuana and alcohol with students."), 56:4–5 ("So I described the pictures to him. I told him that a student had come to me about that"), 56:9–12 ("At that point he became very angry and saying, you known, 'Why are you talking about this? Why are you doing this? Why are you bringing this out?'"), 58:1–6 (quoting Arthur White, "Your loyalty is to Hotchkiss. . . Your first loyalty has to be to Hotchkiss. And if you tell anybody about this, I'll view this as being disloyal to Hotchkiss, and you are out of here.").

[3] *See, e.g.*, Tuke Dep. 19: 11–19 "Q. And were there written rules disseminated to faculty in the period 1975 to 1988 prohibiting sexual contact between teachers and students? A. Written rules specifically to prohibiting sexual contact. Not that I am aware of"), 73: 4–11 ("Q. And nowhere in this book does it say that the school will report sexual activity between faculty and underage students to Connecticut State Police or other authority. Isn't that correct? . . . A. In this particular document, that's correct"), 85:15–21 ("Q. In the period 1977 to 1987 did the school have a written rule for review by faculty barring sexual contact with students? . . . . A. I'm not aware of any written rule, but it was clear that this type of activity or behavior is unacceptable on the campus"), 117: 13–18 (referencing faculty and staff training on obligations under Connecticut law to report child abuse, neglect or imminent risk of harm, "Q. But there was no such formal training while John Doe was a student at Hotchkiss, is that correct? . . . A. I'm not aware of any formal training. Correct."), 124:19–126:20 (referencing the Hotchkiss School's faculty handbook and the lack of grievance procedure for complaints of sexual discrimination, harassment, or violence during the time John Doe attended).

(2d Cir. 2017) (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). But "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Id.* (same). "Nor can complaint of 'the time, effort and money . . . expended in litigating [the] matter,' without more, constitute prejudice sufficient to warrant denial of leave to amend." *Id.* (same).

Here, Hotchkiss has a pending motion for summary judgment and Mr. Doe's reply deadline is December 18, 2018. ECF Nos. 257, 266. According to the amended scheduling order, the parties' Joint Trial Memorandum is due thirty days after the Court rules on dispositive motions and the Trial Ready Date is another thirty days thereafter. ECF No. 250. Because of the limited scope of Dr. Shakeshaft's testimony and length of time until the beginning of trial, it is unlikely that Hotchkiss would need to spend more resources for discovery or trial preparation. Although there will be some delay, the length should be minimal given the limitation on the scope of testimony.

Fourth, neither party has raised the prospect of a continuance.

Overall, given the totality of the circumstances, the Court will exercise its discretion and not allow Mr. Doe to add Dr. Shakeshaft's testimony during his case-in-chief. *See Dietz*, 136 S.Ct. at 1892 ("district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"). Nevertheless, because there is a possibility the evidence at trial may turn out differently than currently described, this denial is without prejudice to Mr. Doe calling Dr. Shakeshaft as a rebuttal witness, after Hotchkiss presents its case.

## IV.    CONCLUSION

For the reasons discussed above, the Court **DENIES** Hotchkiss' motion to prohibit Dr. Charuvastra from testifying as an expert at trial without prejudice to renewal at trial. The Court also **DENIES** Mr. Doe's motion for leave to add Dr. Shakeshaft as an expert witness at trial without prejudice to Mr. Doe calling Dr. Shakeshaft as a rebuttal witness, after Hotchkiss presents its case.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of November 2018.

/s/ Victor A. Bolden

VICTOR A. BOLDEN

UNITED STATES DISTRICT JUDGE