# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN DOE,
     *Plaintiff*,

     v.

HOTCHKISS SCHOOL,
     *Defendant*.

No. 3:15-cv-160 (VAB)

## RULING ON MOTION FOR SUMMARY JUDGMENT

John Doe ("Plaintiff") has sued The Hotchkiss School ("Defendant" or "Hotchkiss") for state-law tort claims related to sexual abuse. Hotchkiss moves for summary judgment in this case against John Doe. Def's. Mot. for Summ. J., ECF No. 257.

For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Hotchkiss' Motion for Summary Judgment.

Plaintiff's claim for intentional infliction of emotional distress will be dismissed, while Plaintiff's claims of negligence, recklessness, negligent infliction of emotional distress, and breach of fiduciary duty will proceed to trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations

When John Doe enrolled at Hotchkiss at the age of fourteen, he allegedly "entered an environment of well-known and tolerated sexual assaults, sexually violent hazing, and pedophilia." Compl., ECF No. 1. Upper classmen, "including school-appointed senior dormitory proctors," allegedly assaulted him on multiple occasions, *id.* at ¶¶ 19–22, and a teacher allegedly sexually abused, drugged, and raped him. *Id.* at ¶ 36.

John Doe further alleges that "The Hotchkiss School charged many thousands of dollars per year for the privilege of attending the school and residing in a dormitory on school grounds," and "Hotchkiss assumed responsibility for, among other things, students' protection, safety and well-being." *Id.* at ¶¶ 9, 10. In his view, Hotchkiss "accepted a duty to [him] and to other minor children in its care and custody to do everything within its power to protect them from sexual abuse by other students and by the school's faculty," even while "the school and administrators knew that there was a history and tradition at the school of older male students . . . subjecting younger students to sexual hazing." *Id.* at ¶¶ 12, 14.

This allegedly predatory environment was "not disclosed to John at any time prior to his arrival at the school," and the "school and its teachers and administrators permitted and condoned the tradition of hazing, and they allowed sexual assaults to occur without punishment and without even a meaningful threat of punishment." *Id.* at ¶¶ 15, 16.

John Doe further alleges several sexual assaults by other students and a muted response by faculty and staff, *id.* at ¶¶ 17–24, as well as sexual assault allegations against a teacher and dormitory master that he alleges Hotchkiss knew or should have known about. *Id.* at ¶¶ 25–45. John Doe believes that "the school created a situation that it knew and should have known was likely to be dangerous to John and to other young children in its care," but "the school refused to take appropriate precautions against the risk of harm." *Id.* at ¶¶ 46, 47.

After allegedly suffering sexual abuse at the hands of other students and a teacher, John Doe allegedly reported the incidents to teachers, staff, and administrators that "took no steps to protect John and other vulnerable children from further assaults." *Id.* at ¶¶ 49–57. John Doe alleges that the trauma he suffered at Hotchkiss limits his "ability to engage in normal . . . activities," "has adversely affected his ability to enter into and maintain lasting meaningful

relationships," irreparably damaged his "ability to maintain intimate physical, sexual and emotional relationships," and caused "physical pain and suffering," *Id.* at ¶¶58–62.

### B. Procedural History

On February 5, 2015, John Doe filed a Complaint against Hotchkiss for negligence, recklessness, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of fiduciary duty. Compl., ECF No. 1.

On April 10, 2015, the parties jointly filed a Rule 26(f) Report. ECF No. 17.

On May 18, 2015, the Court granted a stay until the Connecticut Supreme Court resolved *Doe v. The Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357 (2015). ECF No. 22. On July 2, 2015, the Court lifted the Stay. ECF No. 25.

On July 8, 2015, the parties jointly filed a supplemental Rule 26(f) Report. ECF No. 26. On July 21, 2015, the Court approved a revised 26(f) report. ECF Nos. 28, 29.

On September 14, 2015, Hotchkiss answered the Complaint with affirmative defenses. ECF No. 31.

On April 18, 2016, the Court granted Attorney Antonio Ponvert's motion to withdraw as attorney for John Doe. ECF Nos. 40, 41.

On June 1, 2016, Hotchkiss moved to stay, which the Court denied. ECF Nos. 47, 50.

On July 15, 2016, the parties jointly filed a supplemental Rule 26(f) Report. ECF No. 51.

On July 27, 2016, the Court held a telephonic status conference and issued a scheduling order with modified deadlines. ECF Nos. 53, 54. The amended deadlines included a deadline for Plaintiff to designate experts and provide any expert reports by January 20, 2017.

On December 9, 2016, Hotchkiss moved to compel discovery responses. ECF No. 57. On December 12, 2016, the Court denied the motion to compel without prejudice to renewal if the parties did not resolve the discovery dispute after a telephonic conference. ECF No. 61.

On January 23, 2017, the parties jointly moved for a discovery conference, which the Court granted. ECF Nos. 63, 64. On January 31, 2017, the Court held a telephonic discovery dispute conference. ECF No. 70.

On March 17, 2017, the parties jointly moved for a discovery conference, which the Court granted. ECF Nos. 73, 74.

On March 28, 2017, the Court held another telephonic discovery dispute status conference and issued an order requiring Defendants to produce items designated by the Plaintiff. ECF No. 78.

On May 11, 2017, the parties jointly stipulated to Hotchkiss' motion for independent medical examination, which the Court granted. ECF Nos. 85, 86.

On June 22, 2017, Hotchkiss moved for conference, which the Court granted. ECF Nos. 99, 100. On July 5, 2017, the Court held a telephonic discovery dispute conference where Plaintiff's counsel informed the Court that counsel intended to withdraw from the case immediately, even though depositions were scheduled for the following day. ECF No. 104.

The Court then issued an Order to Show Cause and requested that John Doe appear with counsel at an ex parte proceeding by telephone and show cause why Plaintiff's counsel should not remain until after the deposition scheduled for tomorrow had concluded or, in the alternative, why Plaintiff should not be required to pay the costs incurred by Defendant, if the deposition could not go forward. ECF No. 105.

On July 5, 2017, the Court held a telephonic show cause hearing. ECF No. 106. Based on the representations of John Doe and his counsel during the ex parte telephonic show cause hearing, the Court allowed the withdrawal of Plaintiff's counsel and the July 6, 2017 deposition did not go forward. ECF No. 107.

On July 6, 2017, the Court granted the motion to withdraw John Doe's second set of counsel. ECF No. 113. Considering the issues discussed during the July 5, 2017 show cause hearing, and due to the attorney motions to withdraw as counsel, the Court ordered John Doe to appear at an August 11, 2017 telephonic status conference. ECF No. 112. Because of the age of the case, the Court ordered John Doe to have new counsel by the August 11, 2017 telephonic conference or proceed pro se. *Id.*

The Court cancelled the August 11, 2017 telephonic conference. ECF No. 119. The Court issued an Order to Show Cause as to why the Court should not dismiss the case for failure to prosecute. ECF No. 120.

On September 28, 2017, the Court held a show cause hearing. ECF No. 126. On September 29, 2017, the Court issued an Order directing John Doe to appear pro se, retain new counsel, or provide a statement to the Court as to why the Court should not dismiss the case for failure to prosecute. ECF No. 129. In November 2017, John Doe hired new counsel. ECF Nos. 133–39.

On December 15, 2017, the parties jointly proposed a new scheduling order, which the Court granted in part and denied in part. ECF Nos. 143, 144. The parties' lone dispute was whether the Plaintiff should be permitted to add new experts after the deadline to do so; the Court concluded that John Doe had not shown sufficient good cause to justify granting leave to name additional experts after the deadline for such disclosures and the lack of substantive

movement in this case since July 2017 had delayed the case long enough. ECF No. 144. The

Court, however, did extend the deadlines for fact discovery and the close of discovery to May 4,

2018 and June 1, 2018, respectively. *Id.*

On January 29, 2018, the parties jointly stipulated to an independent medical

examination. ECF No. 148.

On April 17, 2018, the Court held a telephonic status conference and granted an oral

motion to amend the scheduling order. ECF Nos. 160–62.

On May 14, 2018, the parties jointly moved for referral to a magistrate for settlement

purposes, which the Court granted. ECF Nos. 178, 179. The Court referred the case to Magistrate

Judge Garfinkel for a settlement conference. ECF No. 180.

On May 18, 2018, the parties jointly proposed a scheduling order that the Court adopted.

ECF Nos. 184, 188, 189.

On May 25, 2018, Magistrate Judge Garfinkel held a telephonic pre-settlement status

conference. ECF No. 191.

On June 18, 2018, the Court held a telephonic status conference, denying without

prejudice John Doe's motion for order and granting Hotchkiss' motion for extension of time.

ECF No. 198.

On July 3, 2018, Magistrate Judge Garfinkel held a settlement conference with the

parties, which did not result in a settlement. ECF No. 207.

On June 22, 2018, the parties jointly moved for a discovery conference. ECF No. 199. On

July 24, 2018, the Court held an in-person status conference on discovery disputes. ECF No. 215.

The same day, the Court issued an order on the joint motion for discovery conference for

Hotchkiss to provide the Court with the disputed documents for *in camera* review. ECF No. 217.

On September 6, 6018, the Court held a post-discovery status conference. ECF No. 235.

On September 11, 2018, the Court held a telephonic status conference regarding two disputed documents the Court reviewed *in camera*, requiring parties to make supplemental filings. ECF No. 239. On October 25, 2018, the Court issued an order regarding the documents reviewed *in camera*. ECF No. 254.

On November 28, 2018, the Court held a hearing regarding pending expert witness motions. ECF No. 267. The Court denied both the motion *in limine* and motion for leave to add an expert witness. ECF No. 268.

On October 29, 2018, Hotchkiss moved for summary judgment. ECF No. 257. On December 18, 2018, John Doe filed an opposition to Hotchkiss' motion for summary judgment. ECF No. 274. On December 21, 2018, after a telephonic status conference, the Court struck John Doe's opposition. ECF No. 282. That same day, John Doe re-filed his opposition to Hotchkiss' motion for summary judgment. ECF No. 286. On January 25, 2019, Hotchkiss replied to John Doe's response. ECF No. 288.

On February 12, 2019, the Court held a hearing regarding Hotchkiss' motion for summary judgment.

## II.    STANDARD OF REVIEW

Courts will grant a motion for summary judgment when the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing specific facts to prove that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. The moving party, however, may satisfy this burden by pointing to an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When documentary evidence and sworn affidavits supporting a motion for summary judgment "demonstrate[] the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. N.Y.C.*, 874 F.3d 338, 347 (2d Cir. 2017). A court will not credit conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor, the court will

find for the moving party as a matter of law and grant the summary judgment motion. *See Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## III.     DISCUSSION

Hotchkiss seeks summary judgment on each of John Doe's allegations; including (A) negligence, (B) recklessness, (C) negligent infliction of emotional distress, (D) intentional infliction of emotional distress, and (E) breach of fiduciary duty.

For the following reasons, the Court grants Hotchkiss' motion as to the claim of intentional infliction of emotional distress but denies Hotchkiss' motion as to the claims of negligence, recklessness, negligent infliction of emotional distress, and breach of fiduciary duty.

### A.     Negligence

Under Connecticut law, "[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *McDermott v. State*, 316 Conn. 601, 609 (2015) (citing *LePage v. Horne*, 262 Conn. 116, 123 (2002)). Within the duty, "there are two distinct considerations." *LePage*, 262 Conn. at 123. "First it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty." *Id.* And "[t]he issue of whether a duty exists is a question of law." *Id.*

Hotchkiss argues that the school had no duty to John Doe. Hotchkiss asserts that it was not reasonably foreseeable to know that John Doe would suffer injuries from sexual abuse. Hotchkiss contends that there was no way to know that there would be a risk that John Doe would suffer sexual abuse from proctors or from Roy Smith. Hotchkiss also argues that public policy does not support imposing a duty in this case because Hotchkiss did not act in a way that

made sexual abuse by the proctors or Mr. Smith more likely. Moreover, Hotchkiss argues that there was no special relationship between Hotchkiss and Doe that created an affirmative duty to protect him from harm. Hotchkiss thus argues that John Doe is unable to prevail on his negligence claim as a matter of law.

In response, John Doe argues that the issue of duty is a determination for the jury because foreseeability is a factual question. John Doe claims that there are genuine issues of material fact as to the foreseeability of potential sexual abuse at Hotchkiss and whether Hotchkiss knew or should have known about the impermissible conduct. John Doe further argues that courts in Connecticut and across the country have long recognized a special relationship between a school and its students that creates an affirmative duty to protect students from physical and sexual abuse.

In reply, Hotchkiss reiterates that the conduct of the proctors and Roy Smith was unforeseeable to an ordinary party in the school's position. And Doe has failed to offer evidence that Hotchkiss either knew or should have known about the potential for sexual abuse by the proctors or Roy Smith.

The Court disagrees.

### 1.    Duty

Under Connecticut law, a duty determination is "a legal conclusion about relationships between individuals." *McDermott*, 316 Conn. at 609. Finding a legal duty requires "(1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular

consequences or particular plaintiff in the case." *Mazurek v. Great Am. Ins. Co.*, 284 Conn. 16, 29 (2007) (citing *Murdock v. Croughwell*, 268 Conn. 559, 566 (2004)).

First, there was a special relationship between John Doe and Hotchkiss such that an ordinary party in Hotchkiss' position knew or should have known of the general harm suffered by John Doe. Within that special relationship, Hotchkiss had an affirmative duty to protect and warn John Doe from harms that the school should have reasonably anticipated. "Although the law of negligence typically does not impose a duty on one party to act affirmatively in furtherance of the protection of another, there are certain exceptions to that general proposition." *Munn v. Hotchkiss Sch.*, 326 Conn. 540, 550 (2017) (citing 2 Restatement (Third), Torts, Liability for Physical and Emotional Harm §§ 37 through 44 (2012)). One such exception is "the relationship between schools and their students." *Id.* Within this special relationship, the school has an affirmative duty because, "in assuming physical custody and control over its students, [the school] effectively takes the place of parents and guardians . . . ." *Id.* at 552 (quoting *Mirand v. N.Y.*, 84 N.Y.2d 44, 49 (1994)).

The scope of the special relationship, however, is not unlimited. Indeed, "in the student-school relationship, the duty of care is bounded by geography and time, encompassing risks such as those that occur while the student is at school or otherwise under the school's control." *Id.* at 552 (internal citations and citation omitted). While the school is under no obligation to guarantee student safety, "[t]he duty a school owes to students to take whatever precautions are necessary reasonably to ensure the safety and welfare of the children entrusted to its custody and control against harm that the [school] anticipates, or reasonably should anticipate." *Id.* at 554–55 (internal quotation marks and citation omitted). At a minimum, "[w]hat the duty quintessentially entails is to exercise reasonable care in ensuring that students are educated in a safe environment

11

free from many unreasonable risk of harm." *Id.*at 555 (citation and quotation marks omitted).

Here, as a matter of law, Hotchkiss owed an affirmative duty to John Doe. It is undisputed that John Doe was enrolled as a boarding student at Hotchkiss. Compl., at ¶ 7. Under Connecticut law, there was an affirmative duty for Hotchkiss to protect John Doe while he was in their custody due to the special relationship between schools and students. *Munn*, 326 Conn. at 550; *see also* Restatement (Second), Torts § 320, comment (b), p. 131 (1965) ("[A] child while in school is deprived of the protection of his parents or guardian. Therefore, the actor who takes custody . . . of a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him.").

This legal duty required Hotchkiss "to exercise reasonable care in ensuring that students are educated in a safe environment free from any risk of harm." *Munn*, 326 Conn. at 555. These potential harms "include[s] physical and sexual assaults by strangers, other students or school employees." *Id.* at 553–54 (listing cases in California, Hawaii, Louisiana, Nebraska, New Hampshire, New York, Oregon, Maryland, Kentucky, the District of Columbia, Iowa, Massachusetts, Washington, and Florida). As a result, "a school having custody of minor children has an obligation to use reasonable care to protect those children from foreseeable harm during school sponsored activities." *Id.* at 555.

Second, public policy considerations weigh in favor of imposing a duty in this case. When determining whether public policy requires the imposition of a duty, Connecticut law allows for consideration of four factors: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Ruiz v. Victory Props., LLC*, 315 Conn. 320, 337 (2015) (citing

*Monk v. Temple George Assocs., LLC*, 273 Conn. 108, 118 (2005)).

As to the first factor, the Court believes that normal expectations of enrollees and their parents in a boarding school that houses minor children are that the school would take reasonable measures to warn students and parents about the possibility of sexual abuse by students and teachers. School personnel operating the overnight experience of students will have superior knowledge about interactions among students and between students and teachers. Indeed, Hotchkiss had "a general responsibility to protect the minors in their charge while they are away from the custody of their parents." *Munn*, 326 Conn. at 559. This factor therefore weighs in favor of imposing an affirmative duty.

As to the second factor, the Court believes that there is a public policy of encouraging participation in boarding school, while simultaneously ensuring the safety of students. This factor therefore weighs in favor of imposing an affirmative duty.

As to the third factor, the Court believes that recognizing an overnight school's pre-existing duty to warn about, or protect against, foreseeable harms to students will not lead to a flood of similar actions. Because the Connecticut Supreme Court has already recognized a special relationship and corresponding affirmative legal duty for schools to warn and protect students from harm while students are in school custody, *see Munn*, 326 Conn. at 550, this Court's acknowledgement of that pre-existing duty will not change the legal landscape. This factor therefore weighs in favor of imposing an affirmative duty.

As to the fourth factor, Connecticut is one of many states that recognize an affirmative duty for schools to protect minor school children during school activities. *See Munn*, 326 Conn. at 550–51 (listing cases in Connecticut, Arizona, California, Delaware, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Kentucky Louisiana, Maryland, Massachusetts, Mississippi,

Montana, Nebraska, New Hampshire, New York, Oregon, and Washington that recognize an affirmative duty for schools to protect and warn students from harm flowing from the special relationship between schools and students). This factor therefore weighs in favor of imposing an affirmative duty.

In sum, there was an affirmative duty between Hotchkiss and John Doe, and the public policy of Connecticut does not preclude imposing a duty on a boarding school to warn about or protect against the risk of sexual abuse by students and teachers.

### 2. Breach of Duty, Causation, and Damages

Here, the remaining negligence considerations of breach of duty, causation, and damages are factual determinations best decided by a jury. Under Connecticut law, liability determinations for the intentional misconduct of a third party "is fact intensive, and its resolution will depend on the nature and gravity of the risk posed by the potential misconduct of the third party," among other factors. *Doe v. Saint Francis Hosp. & Med. Ctr.*, 309 Conn. 146, 180 (2013). And an "actor's conduct may be negligent solely because he should have recognized that it would expose [another] person . . . to an unreasonable risk of criminal aggression." *Id.* at 176 (internal quotation marks omitted).

For example, in *Doe v. Boy Scouts of Am. Corp.*, 323 Conn. 303 (2016), the plaintiff presented evidence that "defendant engaged in affirmative acts of promoting and endorsing Boy Scout activities, such as overnight camping, that created opportunities for sexual abuse." *Id.* at 324. When this was coupled with evidence "that the defendant knew of numerous instances of sexual abuse during such activities[,]" the Court concluded that there was a prima facie case that the defendant should have realized the likelihood that its conduct would create temptation that could lead to sexual abuse. *Id.* at 324–25 (citing *Saint Francis Hosp. & Med. Ctr.*, 309 Conn. at

176–77). The Court concluded that a reasonable jury could determine that the Boy Scouts were potentially liable for an increased risk of sexual misconduct. *Id.* at 327 ("Even if the percentage of participants in the Boy Scouts who were sexual predators was no greater than the percentage of sexual predators in the general population, a jury reasonably could find that [opportunities for minors to be unsupervised or evade supervision while spending time in remote locations] provided participants with a greater opportunity to engage in sexual abuse. A jury could also reasonably infer that this increased opportunity would, in fact, attract a disproportionate number of individuals with sexually predatory inclinations.").

Here, any number of Hotchkiss' actions could have led to an increased likelihood of sexual misconduct by proctors and teachers. By Hotchkiss' own admission, school officials understood and recognized that the school had a responsibility to keep students safe.[1] Yet Hotchkiss did not have formal rules, training and procedures related to sexual misconduct between teachers and students.[2] Moreover, it is unclear whether Hotchkiss provided training and instruction related to sexual misconduct for its student proctors.[3] The Court therefore finds that a reasonable jury could determine that Hotchkiss could be liable for an increased risk of sexual misconduct.

---

[1] Tuke Dep. Tr. 17:6–12 ("Q. Is it important for a school like Hotchkiss to prevent sexual abuse of students by teachers? A. I think it is important. Q. Why? A. Why? Because schools are entrusted with the safety and well-being of students.").

[2] *Id.* at 17:20–19:17(detailing Hotchkiss rules, trainings, and practices related to sexual contact between teachers and students); 19:11–22 ("Q. And were there written rules disseminated to faculty in the period 1975 to 1988 prohibiting sexual contact between teachers and students? A. Written rules relating specifically to prohibiting sexual contact. Not that I am aware of. Q. Why not? A. I think that was a clear expectation on the part of the adults in the community that behavior is not -- I mean you can legislate all kinds of behavior."); 123:10–127:1 (establishing that Hotchkiss did not have policies and procedures for handling sexual misconduct claims while John Doe was a student).

[3] *Id.* at 21:4–9 ("Q. And were student proctors given trainings on prevention of sexual abuse of students? . . . A. There was training. I don't know how specific the training was relating to that topic.").

15

The final determination of that liability, however, should be decided by a jury. *See Vendrella v. Astriab. Family Ltd. P'ship.*, 311 Conn. 301, 338 (2014) ("the determination as to whether a particular risk is unreasonable is to be left to the jury when reasonable minds could reach different conclusions"); *Fogarty v. Rashaw*, 193 Conn. 442, 446 (1984) ("Issues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner."); *see also* Restatement (Third), Torts, Liability for Physical and Emotional Harm § 8 (2010) ("The longstanding American practice has been to treat the negligence question as one that is assigned to the jury . . . Accordingly, so long as reasonable minds can differ in evaluating whether the actor's conduct lacks reasonable care, the responsibility for making this evaluation rests with the jury."); *Stewart v. Federated Dept. Stores, Inc.*, 234 Conn. 597, 611 (1995) ("The question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue."); *Archambault v. Soneco/Northeastern, Inc.*, 287 Conn. 20, 32 (2008) (recognizing that there must be an "injury in fact" for a negligence action). The Court therefore finds that there are genuine issues of material fact as to the negligence claim that should be resolved by a jury. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) ("The '[e]valuation of ambiguous acts' is a task 'for the jury,' not for the judge on summary judgment.") (citation omitted).

As a result, the motion for summary judgment will be denied as to this claim.

## B.    Recklessness

Recklessness is an alternative avenue of tort liability that is "more than negligence and is also more than gross negligence." *Rubel v. Wainwright*, 86 Conn. App. 728, 741 (2005) (citing *Dubay v. Irish*, Conn. 518, 532 (1988)). Recklessness refers to "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger

is apparent." *See Belanger v. Village Pub I, Inc.*, 26 Conn. App. 509, 513 (1992) (citation omitted). A viable recklessness claim requires the plaintiff to show "a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable [person], and the actor must recognize that [their] conduct involves a risk substantially greater . . . than that which is necessary to make his [or her] conduct negligent." *Bishop v. Kelly*, 206 Conn. 608, 614–15, (1988) (quoting *Begley v. Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 450 (1969)).

Hotchkiss argues that because there was no evidence it knew about abuse by either the proctor or Roy Smith before they allegedly abused John Doe, there is no evidence that Hotchkiss ignored a high risk of harm. Without a link between evidence of Hotchkiss' knowledge of the abusive behavior and inaction leading to an increased risk of harm, Hotchkiss argues that John Doe is unable to prevail on his recklessness claim as a matter of law.

In response, John Doe argues that Hotchkiss knowingly failed to adopt student safety policies and comply with legal requirements to prevent sexual abuse. Along with encouraging after-school interaction in teacher apartments and willfully violating Connecticut reporting laws related to sexual misconduct, John Doe argues that Hotchkiss' conduct indicates a reckless disregard for the safety of students and the consequences of the school's policies.

In reply, Hotchkiss argues that Doe's recklessness claims are based on evidence that is either inadmissible or unrelated to the underlying conduct. For this reason, as well as the lack of foreseeability of the conduct of either Roy Smith or the proctors, Hotchkiss argues the recklessness claim must fail.

The Court disagrees.

"Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable [person], and the actor must recognize that [their] conduct substantially greater . . . than that which is necessary to make his [or her] conduct negligent." *Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382 (2015) (citation omitted). "The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." *Id.* (quoting *Matthiessen v. Vanech*, 266 Conn. 822, 832–33 (2003)).

Here, John Doe has presented evidence that Hotchkiss was aware of instances of sexual abuse at the school in the years preceding his enrollment, and while he attended the school. Hotchkiss officials understood and recognized that the school had a responsibility to keep students safe.[4] Hotchkiss staff, however, were not receptive to teachers reporting sexual assault of students by teachers.[5] As an institution, Hotchkiss arguably failed to comply with state reporting requirements and investigate allegations of sexual abuse when they were reported to administrators.[6] In fact, Hotchkiss did not implement sexual abuse policies until the late-1990s

---

[4] *See supra* note 1.

[5] Stacks Dep. Tr. 55:5-58:14 (detailing a conversation with Headmaster Arthur White where he exclaimed that teachers need to have loyalty to Hotchkiss when a teacher reported an instance of sexual assault by Hotchkiss staff); 70:3–71:6 (stating that Headmaster White never spoke with Ms. Stacks about the incident after she reported it).

[6] *Id.* at 27:24–28:10 ("Q. During your time at Hotchkiss, did Hotchkiss inform you, as a faculty member, what to do if you observed what you considered to be inappropriate sexual conduct? A. No . . . Q. During your time at Hotchkiss, did Hotchkiss inform you, as a faculty member, of your obligation under Connecticut state law to report

or early 2000s.[7] Finally, Hotchkiss never instructed students on how to report or recognize sexual misconduct.[8]

Specific to Roy Smith, John Doe claims that he was sexually assaulted by Roy Smith on four occasions. First, it allegedly happened when he went to Roy Smith's apartment for leg treatment after a sports injury.[9] Second, after another visit to receive treatment on his leg, he

---

[7] Downs Dep. Tr. 59:12–60:5 ("Q. During your time at Hotchkiss, did Hotchkiss have any policies or procedures for students to report incidents of inappropriate touching? . . . THE WITNESS: Not that -- not that I was ever instructed on as a faculty member. Not in the beginning. I think -- and I can't remember what era the mandatory reporting came in. That might have been in the late 90's. But certainly in the first seven, eight years, plus, maybe even more of a decade, there wasn't any protocol of if you thought, if there was something."); 61:7–62:18 ("When -- what time period was that, that that came about? A. I think that was probably in the late '90s, early 2000s. Nancy Byrd was the head of -- Nancy Byrd did a lot of innovative things in health services during that era. And I think that was one of those, to try to have kids more connected, try to avert crises before they really blew up. Q. So prior to that time period when that confidential note system was implemented, was there any other policy or procedure for students to report something like inappropriate touching? . . . THE WITNESS: I mean, I don't -- you know, that's a great question. I don't even remember as a faculty member having, you know -- being told, you know, if I had a concern where to go. In fact, the administrative structure at Hotchkiss was such that, you know, for -- especially for young faculty, it was -- you know, it was always a bit imposing to go to the dean of students or to the dean of faculty to, you know, share a concern. You know, you better have had your ducks in a row. You better know your stuff before you're going to go and, you know, bring something to them. Otherwise they didn't want -- you handle it, don't be bothered.").

[8] Stacks Dep. Tr. 28:19–23 ("Q. During your time at Hotchkiss, are you aware of whether the school informed the students of how to recognize sexual misconduct? A. Not to my knowledge. They did not. To my knowledge, they did not."); Damon White Dep. Tr. 71:10-73:1(testifying that Hotchkiss provided no training or information about inappropriate relationships between students and faculty, inappropriate touching between students and faculty, or inappropriate touching behavior between people); Chandler Dep. Tr. 65:6–66:3 ("Q. Were there any procedures in which the children were supposed to do something if something inappropriate happened with a teacher? . . . I honestly don't -- I don't know what that was -- Q. That wasn't a written policy anywhere? . . . A. Not -- no. Q. And the children weren't given any instructions like that at any time? . . . -- during the 1980s; is that correct? A. I don't remember it."); Chandler Dep. Tr. 75:5-12 ("Q. And was there any policy or procedure for conducting [a student allegation of mistreatment] investigation in the 1980s? A. I'm not sure there was a policy. But I certainly think that the faculty would have brought that to the attention of the dean of students and then it would have proceeded from there.").

[9] John Doe Dep. Tr. 173:19–174:13 ("Q. What treatment were you seeking from Mr. Smith when he did this? A. I was having -- I believe one of the issues I was having, he was touching, was my hamstring was getting tight or hurting a little bit, inflamed. I don't know exactly what it was . . . And the first time I noticed it is like he had reached up past, you know, under my shorts and I didn't know what to make of it because he didn't touch it very long. I just thought he was trying to move it out of the way or his hands brushed it as he was like, you know, getting

allegedly was groped again. [10] Third, Roy Smith allegedly grabbed John Doe's genitals a third

time.[11] Then, Roy Smith allegedly drugged and raped John Doe in his apartment.[12]

    During and after these events took place, John Doe allegedly told teachers and

administrators about Roy Smith's conduct. On multiple occasions, John Doe allegedly detailed

his sexual assault claims to his Latin teacher.[13] Then, John Doe allegedly attempted to write a

---

onto the muscle there or the tissue or whatever is underneath there to figure out what was going on. Q. Where were you when this happened? A. In his apartment.").

[10] *Id.* at 177:19–178:11 ("Where were you when he touched your genitals the second time? A. In his apartment. Q. Why were you there? A. Same basic reason, he was working on my leg again . . . Q. What happened that time? A. Essentially, the same thing. He was examining it and his hand brushed over again and touched, you know, as he was examining me, you know, my leg, it touched that area again.").

[11] *Id.* at 178:24–179:7 ("Q. How about the third time? A. The third time that I recollect was a little -- he reached up over my boxer shorts, the top, while he was working the, again, examining the leg area and reached down over the top of the leg, and then his hands strayed and grabbed onto my private parts. And this wasn't just an inadvertent touching, it was more of a groping."); 179:23–24 ("Q. Where did this third instance occur? A. In his apartment, sir."); 181:1–182:7 ("Q. And this time he -- explain how he touched your genitals on this occasion? A. One of his hands was on the leg from underneath it and the other hand went up and brushed over my belly and I could feel I, and it reached down and I could feel it over my hairs down there, the pubic hairs. And then he reached down and just grabbed -- like he held and grabbed onto my privates. And it was a really creepy feeling to have that happen. And it's like his hand, it just like right over my belly and down the shorts. And it's like -- and that was just weird. I didn't -- I just remember that sensation, the hand over my belly and touching them. Q. His entire hand was in contact with your penis and scrotum; is that right? A. Yes, sir. Q. And how long did that contact last? A. I don't know. I was kind of frozen. I don't know if it was a few seconds or 10 or 20 seconds. I mean it wasn't an eternity, but it just -- I just, I remember sitting sort of straight up after a little bit and just trying to, wanting to go out of there. Q. Did you say anything? No, sir. Q. Did he say anything? No, sir."); 182:16–23 ("Q. He put his hand inside your boxer shorts? A. Yes. Q. You were wearing shorts of some kind with boxers underneath? A. Yes, sir.").

[12] *Id.* 252:15–253:17 ("Q. So you took this aspirin in his presence; is that right? A. Yes, sir. Q. What happened next? A. I stayed in his apartment to start talking and my memory gets a little foggy. And I know we were there and I was on the couch. And then I felt some -- then the next sort of thing that I remember was I was -- there was a funny feeling in my butt. It was like a huge thermometer from when I was a little baby was being put in there or something. That feeling of pressure that you get with a thermometer or something in there. And I just -- and I didn't realize I was -- I wasn't seeing and I tried to open my eyes a bit, and I was looking at his -- at the -- at the end of the couch. I was looking at the couch and the pressure was behind me. And I was -- I tried to move and really couldn't move very much. And I turned my head and he was behind me sort of over me. And I was like laying on the couch and I couldn't move. I don't know why I couldn't move, really. And it was -- it was inside me pushing in me, something, I don't know. And I couldn't stop it, and I couldn't move and I couldn't talk and --.").

[13] *Id.* at 236:7–237:2 ("Q. Did he -- did you tell him that this older teacher had put his penis in your rectum? A. No, I never -- I don't know if he put his penis in my rectum. I don't know what he put in it. It could have been his penis, it could have been his finger, it was part of him, but I don't know what it was because I never actually could see what part of what -- what he did. He was just inside of me on top of me. I presumed it was his penis, but I don't know, and I just told him that I thought that's what was inside me. But I told him, I woke up, you know, I came around and I told him what I told you had happened. And that he was on top of me and something was inside my butt and it was moving around and it was pressure, and I just didn't know what to make out of it. I was just really confused by it. And that's the essence of what I told Mr. Rutherford-Dyer then.").

newspaper article detailing his sexual abuse by Roy Smith and submitted a draft to Headmaster Arthur White.[14]

Additionally, John Doe asserts that he was sexually abused and assaulted by student proctors while at Hotchkiss on multiple occasions.[15] John Doe allegedly reported proctor abuse to Headmaster White multiple times,[16] allegedly reported the abuse to his teacher,[17] and allegedly attempted to write a newspaper article about his sexual abuse and submitted a draft to Headmaster White.[18]

---

[14] Tuke Dep. Tr. 89:13–90:2 ("Q. Okay. Do you have any information about John Doe's proposed newspaper article? A. Yes. Q. Tell me what you know about that. A. My understanding is that John Doe was writing an article that he wanted to print, that he ran it by Art White. Art White told him not to publish it. It did not get published. I read and talked to people about what the process by which such student publications were governed and that it was never the practice that a head of school or I believe in this case there was an allegation that the board chair was involved. That is not the practice, and I don't believe that occurred.").

[15] John Doe Dep. Tr. 17:12–21 ("Q. So the first time you spoke with Arthur White about your experience with proctors abusing you was the fall of 1985; is that right? A. Yes, sir. Q. The first fall you were on campus? A. Yes, sir, and it was prior to the time he dismissed those three proctors for their having, you know, abused and sodomized a number of students, including me, that was the first time I had spoken with him about it."); 162:17–163:5 ("Q. And do you know who inserted the object into your rectum a second time? A. No, sir, I don't recollect. I don't know for certain which one it was. Q. What was the object? A. it was a Halloween decoration. It was like a little plastic -- what do you call those things, tridents. It has like, you know, it's like a pitchfork with like -- it's like a broomstick kind of little handle, but a small one.").

[16] John Doe Dep. Tr. 20:7–10 ("Q. How many times did you tell Arthur White that a proctor had hit you with a wooden paddle or had inserted -- or anybody had hit you with a wooden paddle or anybody had inserted any object in your rectum? A. Multiple times. I don't know a precise number."); 21:12–22:8 ("Q. . . . I'm asking what you discussed with Mr. White and how many times you discussed that issue with Mr. White. What's your best estimate? A. I don't have an estimate. More than once, yes. Was it more than four or five times, yes. Could it have been 8 or 10, maybe. Could it have been 20 or 30, possibly. It was a topic that was just sort of a normal part of the conversation of activities and news and things that were occurring at the school and had occurred at the school at the time I was at the school. Q. It was a normal topic of conversation of you and Mr. White that you were being hit with a wooden paddle by proctors and having objects inserted in your rectum? A. It was a normal topic of conversation around the school for a lot of people. I know I discussed it with Mr. White. I discussed it with him several times, and I don't know how many times that exact number is.").

[17] John Doe Dep. Tr. 136:18–137:10 ("Q. How soon after they had started hitting you did you tell Mr. Seeley that you were being hit by the three proctors with a wooden paddle? A. As soon as my bottom was so sore, it hurt so much, because he was also by cross country coach, that I couldn't even run and I needed to be excused from practice. I don't know what day it was, but it was when it got so bad, it hurt so much and it was so enflamed and bruised and bleeding and I couldn't show up for practice. Q. You were bleeding? A. When I went to the bathroom afterwards. Q. Where were you bleeding from? A. When I had a bowl movement, there was some red blood that came out.").

[18] *See supra* note 14.

21

Because of this testimony, reasonable minds could disagree as to whether the risk of dormitory sexual abuse was sufficiently great that Hotchkiss either knew or should have known that its failure to take precautions would expose students to a greater risk of harm. As discussed above, there was an affirmative duty for Hotchkiss to protect and warn John Doe. *See Munn*, 326 Conn. at 550. Further, recklessness requires a factual state of mind determination, which "may be inferred from conduct." *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. at 382.

"But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." *Craig v. Driscoli*, 262 Conn. 312, 342 (2003), *overruled on other grounds by Caciopoli v. Lebowitz*, 309 Conn. 62 (2013). The sort of fact-intensive determination required to determine whether conduct is "such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention," is the proper avenue of a jury. *Id.* at 343. Accordingly, given the evidence in this record, there is a genuine issue of material fact to be determined by a jury. *See Vendrella*, 311 Conn. at 338 ("the determination as to whether a particular risk is unreasonable is to be left to the jury when reasonable minds could reach different conclusions").

The Court therefore finds that there are genuine issues of material fact as to the recklessness claim that should be resolved by a jury. *See Redd*, 678 F.3d at 174 ("The '[e]valuation of ambiguous acts' is a task 'for the jury,' not for the judge on summary judgment.") (citation omitted).

As a result, the motion for summary judgment will be denied as to this claim.

### C.    Negligent Infliction of Emotional Distress

For a successful negligent infliction of emotional distress claim, a plaintiff must prove that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). In such cases, the "fear or distress experienced by the plaintiffs [must] be reasonable in light of the conduct of defendants." *Id.* at 447 (citing *Barrett v. Danbury Hosp.*, 232 Conn. 242, 261–62 (1995)). When that fear is reasonable, "the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be liable." *Id.* At the same time, fear that was "unreasonable in light of defendants' conduct" would not allow defendants to recognize "that their conduct could cause distress, and therefore, they would not be liable." *Id.*

Hotchkiss argues that John Doe cannot prove that it was foreseeable that Hotchkiss' alleged misconduct would cause emotional distress. Without evidence of foreseeability, Hotchkiss asserts that John Doe cannot prevail on his claim for negligent infliction of emotional distress as a matter of law.

In response, John Doe argues that the foreseeability element of a negligent infliction of emotional distress claim, like negligence generally, is a question of fact. John Doe further argues that Hotchkiss either knew or should have known about the potential for sexual abuse, which directly led to student emotional distress.

In reply, Hotchkiss argues that John Doe lacks admissible evidence to establish that his emotional distress was foreseeable. Moreover, that Hotchkiss argues John Doe can only succeed

by claiming that, if Hotchkiss had proper policies and procedures in place, the likelihood of the sexual abuse taking place would have decreased.

The Court disagrees.

### 1. Foreseeability of Plaintiff's Alleged Distress

Under Connecticut law, "[a] claim based on the negligent infliction of emotional distress requires only that the actor's conduct be unreasonable and create an unreasonable risk of foreseeable emotional harm." *Olson v. Bristol-Burlington Health Dist.*, 87 Conn. App. 1, 7 (2005). This foreseeability requirement "is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm." *Id.* at 5 (citing *Scanlon v. Conn. Light & Power Co.*, 258 Conn. 436, 446–47 (2001)). To succeed under this higher standard, "the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." *Id.*

Here, John Doe has provided evidence suggesting that Hotchkiss knew about sexual abuse, tolerated sexual abuse, and created a culture of protecting abusers. Hotchkiss allegedly failed to act when teachers reported sexual assault of students by teachers.[19] Hotchkiss allegedly failed to institute anti-sexual abuse policies or follow state reporting requirements of sexual assault.[20] And Hotchkiss allegedly failed to instruct students on how to report or recognize sexual misconduct.[21] Based on the admissible evidence in this record, there is a genuine dispute

---

[19] *See supra* note 5.

[20] *See supra* note 6.

[21] *See supra* note 8.

of material fact as to the foreseeability of student and teacher sexual abuse where "a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248

2. <strong>Unreasonable Risk of Causing Emotional Distress, Causation of the Plaintiff's Alleged Stress, and Severity of Emotional Distress</strong>

In order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove to the jury that defendant's "conduct involved an unreasonable risk of causing emotional distress, and, from the facts known to it or its agents, knew or should have realized that this emotional distress, if caused, might result in illness or bodily harm." *See Scanlon*, 258 Conn. at 444. Moreover, a finding of severe emotional distress is a fact-intensive inquiry. *Carrol*, 262 Conn. at 445–46 (finding that plaintiff accusations of wrongdoing that "greatly impacted the plaintiff's relationship with those in his community" were enough for a reasonable jury to find that defendant's conduct "caused the plaintiff severe emotional distress").

Here, John Doe has provided evidence probative of emotional distress. In the immediate aftermath of Roy Smith's sexual assault, John Doe allegedly experienced physical manifestations of emotional distress.[22] In the following weeks, he allegedly was confused and shaken by the encounter.[23] Since his time at Hotchkiss, the physical manifestations of his sexual abuse

---

[22] John Doe Tr. 257:7–16 ("Q. So he got off you and then what did you do? A. When I came to, I became more aware of what was around me. I was -- I felt so sick and I was so confused. And I think I said I gotta go. I don't even know if I said it out loud or just thought it in my head. And I walked out of that apartment and I was so nauseated."); 260:10–19 ("And I walked up the stairwell on the right up to my floor, the fourth floor above, and when I came out, I was feeling really nauseated. And I went to, instead of turning left to go to my room, I turned right and went down to our floor bathroom, and I just vomited into the toilet. It just came out. It was like, just opened my throat and it just poured out. It was so much.").

[23] *Id.* at 234:2–235:11 ("And did you make clear that it was an older teacher at Hotchkiss who had done this to you in the last several months? A. In the last couple of weeks, yes, sir. Q. And it happened several weeks before? A. Within a couple of weeks. I don't remember exactly when I went to Mr. Rutherford-Dyer to speak about it. After the event, I was kind of a mess inside, confused, not sleeping well, and I wanted to speak with Mr. Rutherford-Dyer about it and I just don't know when it was exactly, if it was a few days or a week or so after it. But I went and sat down and made an appointment, sat down and had a long conversation in his office. I don't know if the door closed. I don't know if it was half an hour or an hour, but it was a really long conversation with him . . . Q. What did you tell him? A. I told him the gist of what I told him, and I don't remember the precise words was that I was getting confused about something that seemed kind of sexual maybe. And that an older male teacher had done these things

25

allegedly have continued.[24]

Accordingly, the Court concludes that the remaining issues of reasonableness and causation are for the jury. *See Vendrella*, 311 Conn. at 338 ("the determination as to whether a particular risk is unreasonable is to be left to the jury when reasonable minds could reach different conclusions"); *see also Stewart*, 234 Conn. at 611 ("The question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue.").

The Court therefore finds that there are genuine issues of material fact as to the negligent infliction of emotional distress claim that should be resolved by a jury. *See Redd*, 678 F.3d at 174 ("The '[e]valuation of ambiguous acts' is a task 'for the jury,' not for the judge on summary judgment.") (citation omitted).

As a result, the motion for summary judgment will be denied as to this claim.

### D. Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress claim, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011) (citing *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000)).

---

to me and had, you know, that he had put stuff, [p]ut himself into my butt and had been really nice to me before that thing, and I was just confused by it.").

[24] *Id.* at 268:14–24 ("Q. What are the consequences that you've experienced? A. Problems sleeping and stress issues that come from it, and I sought treatment for those symptoms of it in the broader sense, and I sought for those things specifically. And then I've also recently started speaking to my internist and told him about what happened, as I'm trying to figure out ways to manage and deal with the consequences of it for me and my health in better ways, I hope."); 271:2–9 ("Q. You concluded that the rapes, as you call them, in Hotchkiss lead to your sleeplessness today? A. They -- yeah, they often and for a very long time in periods have very adversely impacted my sleep and ability to sleep well, which then leads to other health issues and complications sometimes.").

Hotchkiss argues that neither the school's acts nor omissions constitute the extreme and outrageous conduct necessary for intentional infliction of emotional distress. Hotchkiss asserts that Connecticut law does not allow for employer liability for the criminal conduct of employees. Hotchkiss contends that Connecticut law does not allow for nonfeasance to constitute conduct in support of a claim for intentional infliction of emotional distress. And, without evidence of affirmative act by Hotchkiss, there is no way to find extreme and outrageous conduct as a matter of law.

In response, John Doe argues that nonfeasance does not prohibit a finding of intentional infliction of emotional distress. Doe argues that the atrocious acts shown in the record regarding Hotchkiss actions regarding student policies, a lack of reporting, and encouraging student-teacher interaction after school hours in private residences, trigger liability for intentional infliction of emotional distress.

In reply, Hotchkiss argues that Doe offers no evidence that Hotchkiss intentionally failed to prevent Doe's sexual abuse or knew or should have known that Roy Smith or the proctors sought to harm Doe. Without evidence of the willful action that led to Doe's emotional distress, Hotchkiss argues that the intentional infliction of emotional distress claim must fail.

The Court agrees.

### 1.    Intentional Infliction of Emotional Distress

Under the doctrine of respondeat superior, an employer is liable for torts committed by an employee "within the scope of his employment and in the furtherance of the employer's business." *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 208 (1990) (citations omitted). Whether an employee's willful conduct was within the scope of employment is generally a factual issue, except when the employee's action is outside of the scope of

employment as a matter of law. *Id.* at 207. Indeed, many Connecticut "trial court judges have held that sexual misconduct by an employee occurs outside the scope of employment." *See v. Bridgeport Catholic Diocesan Corp.*, 1997 WL 466498, at \*3 (Conn. Super. Ct. 1997) (listing cases where trial courts have found that an employer is not vicariously liable for sexual assault by an employee).

Here, although John Doe argues that Hotchkiss' failure to adopt student safety policies allowed for sexual misconduct to occur at the school, John Doe provides neither testimony or exhibits suggesting that Hotchkiss intended to have John Doe sexually abused. *See* Pl's Opp. to Hotchkiss School's Mot. for Summ. J., ECF No. 286, at 35–37. Policy inaction may rise to the level of negligent or reckless behavior under the circumstances, but, for purposes of establishing an intentional tort, Hotchkiss' non-feasance alone is not enough. *See Abate v. Circuit-Wise, Inc.*, 130 F. Supp. 2d 341, 348 (D. Conn. 2001) (holding that "alleged negligent failure of defendant to prevent the harassment" was not enough from "which a reasonable jury would be permitted to infer that defendant's conduct was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress" (citations omitted)); *Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12, 22 (D. Conn. 2003) (holding that behavior "[c]haracterized as either a failure 'to respond' or 'to prevent' or 'choos[ing] to ignore,'" sexual harassment by a supervisor "does not rise to the level of extreme and outrageous behavior"); *Williams v. Cmty. Sol., Inc.*, 932 F. Supp. 2d 323, 337–38 (D. Conn. 2013) (holding that "insufficient investigation" of sexual harassment was not enough to support an intentional infliction of emotional distress claim).

While John Doe's testimony may create a genuine issue of material as to the effectiveness of Hotchkiss policies in preventing sexual abuse of students, this testimony cannot be probative of whether Roy Smith's misconduct occurred within the scope of his employment

as a matter of law. *See See*, 1997 WL 466498, at *3 ("Many trial court judges have held that sexual misconduct by an employee occurs outside the scope of employment."). This testimony also does not show that the actions attributed to Roy Smith were in the furtherance of, or incidental to, his duties as a teacher employed by Hotchkiss. *See Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 505 (1995) (finding that respondeat superior "refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.") (quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 70, at p. 502). Finally, there is no evidence to demonstrate how sexual abuse, sexual assault, or sexual exploitation benefited Hotchkiss or furthered its business as a school. *See id.* at 500–01 ("[I]n order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business.") (quoting *Cardona v. Valentin*, 160 Conn. 18, 22 (1970)).

Ordinarily, determination of whether an employee acted within the scope of his or her employment is a question of fact for the jury to decide, in some situations—as is the case here— "the acts of the [employee] are so clearly without the scope of his authority that the question is one of law." *Brown v. Hous. Auth.*, 23 Conn. App. 624, 628 (1990) (citation omitted), *cert. denied*, 217 Conn. 808 (1991).

The issue of whether an intentional infliction of emotional distress claim could have been brought against Mr. Smith or the proctors who allegedly abused Mr. Doe, however, is not before the Court. Because both the alleged actions of Mr. Smith as well as of any Hotchkiss proctor were not within the scope of their duties as a matter of law, the issue instead is whether an intentional tort claim can be brought against Hotchkiss, as an entity. As a matter of law, for such

a claim to survive summary judgment, there would have to be evidence in the record that Hotchkiss hired, desired, or expected Roy Smith or the proctors to abuse Mr. Doe sexually as part of their work for the school. *See Larsen*, 232 Conn. at 501 (finding that "it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for [respondeat superior] to apply.").

In this record, there is no such evidence. Instead, the evidence supports the possibility of liability for claims of negligence, recklessness, negligent infliction of emotional distress, and, as discussed below, a breach of fiduciary duty, but not liability for a claim of intentional infliction of emotional distress. Based on the evidence in this record, the jury would have to speculate to find that Hotchkiss intended for Roy Smith or the proctors to sexually abuse John Doe, or that Hotchkiss acted intentionally to further John Doe's alleged sexual abuse, which it cannot do. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

As a result, summary judgment will be granted as to Mr. Doe's intentional infliction of emotional distress claim.

### E. Breach of Fiduciary Duty

To succeed with a breach of fiduciary duty claim, a plaintiff must meet four elements: "[1] [t]hat a fiduciary relationship existed which gave rise to . . . a duty of loyalty . . . an obligation . . . to act in the best interests of the plaintiff, and . . . an obligation . . . to act in good faith in any matter relating to the plaintiff; [2] [t]hat the defendant advanced his or her own interests to the detriment of the plaintiff; [3] [t]hat the plaintiff sustained damages; [and] [4] [t]hat the damages were proximately caused by the fiduciary's breach of his or her fiduciary

duty." *Chioffi v. Martin*, 181 Conn. App. 111, 138 (2018) (citing *Rendahl v. Peluso*, 173 Conn. App. 66, 100 (2017) (emphasis and internal quotation marks omitted)).

Hotchkiss argues that, aside from daily and direct interaction with its students, Hotchkiss owes no fiduciary duty to students. Hotchkiss also argues that a breach of fiduciary duty cannot be found without an allegation of fraud, self-dealing, or conflict of interest. Further, because John Doe has no special relationship to Hotchkiss, there is no fiduciary duty.

In response, John Doe argues that the unique degree of trust and confidence between Hotchkiss and Doe, along with the special relationship they shared as school and pupil, create a reasonable question for the jury as to whether there was a breach of a fiduciary relationship. Moreover, John Doe argues that the contours of the fiduciary relationship involve questions of fact not properly resolved at the summary judgment stage.

In reply, Hotchkiss argues that a fiduciary relationship is a question of law and there is no evidence that Hotchkiss knew or encouraged John Doe to enter into a special relationship with Roy Smith. Even if John Doe could establish a relationship of confidence with Roy Smith, he fails to provide admissible evidence that Hotchkiss ever knew about or encouraged those relationships.

The Court disagrees.

### 1.       Fiduciary Relationship

Under Connecticut law, a "fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Biller Assocs. v. Peterken*, 269 Conn. 716, 723 (2004) (quoting *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (2000)). While "agents, partners, lawyers, directors, trustees, executors, receivers,

bailees and guardians" are all recognized fiduciaries, *see Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 108–09 (2007), Connecticut law has a flexible approach to determine the existence of a fiduciary duty based whether "the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Hi-Ho Tower*, 255 Conn. at 38 (citing *Dunham v. Dunham*, 204 Conn. 303, 305 (1987)).

Here, the trust, superior knowledge, and superior expertise of Hotchkiss established a fiduciary relationship between John Doe and the Hotchkiss School. Because John Doe lived on campus at Hotchkiss, where Hotchkiss controlled the property, Hotchkiss was in the dominant position compared to John Doe while he was enrolled at the school. Based on the evidence in this record, John Doe's parents were concerned about sending him away to boarding school,[25] which also weighs in favor of the fiduciary relationship. Hotchkiss thus arguably had a fiduciary duty to John Doe based on its dominant position, John Doe's dependency as a boarding school student, and the affirmative duty the school had to warn and protect John Doe from foreseeable harm under Connecticut law. *See Binder v. Windmill Mgmt., LLC*, No. FSTX08CV106004435S, 2013 WL 593936, at *10 (Conn. Super. Ct. 2013) ("[T]he law will imply fiduciary responsibilities only where one party has a high degree of control over the property or subject matter of another and the unsuspecting party has placed its trust and confidence in the other.") (quoting *Hi–Ho Tower*, 255 Conn. at 41)).

---

[25] Father of John Doe Dep. Tr. 40:20–41:9 ("But I'll tell you one thing: My wife and I were very concerned about sending him away . . . And we checked the prep schools, we talked with them, we wanted to know. As far as we know, they were en lo preferente. And that's what we were worried about. Fourteen years old is a young age, and -- but I didn't know; we liked Hotchkiss, we liked Groton, and I think you took us to one or two others. They all seemed very good. Each had a little different flavor.").

## 2. Defendant's Alleged Action to the Detriment of Plaintiff

Under Connecticut law, there must be sufficient facts for a court to conclude "the defendant advanced [his or her] interests to the detriment of the plaintiff's interests." *Chioffi*, 181 Conn. App. at 139. Based on John Doe's statements alleging sexual assault and abuse being reported to Hotchkiss without subsequent action,[26] there are sufficient facts to support a conclusion that Hotchkiss acted to advance its interests in not publicizing sexual abuse to the detriment of John Doe's interest in not being sexually abused.

## 3. Plaintiff's Alleged Damages were Proximately Caused by Defendant's Conduct

The remaining questions of causation and damages are factual questions that should be decided by a jury. *See Stewart*, 234 Conn. at 611 ("The question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue."); *see also Carrano v. Yale-New Haven Hosp.*, 279 Conn. 622, 646 (2006) ("Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.") (quoting *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 554 (1999)); *Bozelko v. Papastravros*, 323 Conn. 275, 283 n.10 (2016) ("a plaintiff alleging a breach of fiduciary duty must show that any damages sustained were proximately caused by the fiduciary's breach of his or her fiduciary duty."). Accordingly, the Court concludes that the remaining issues of breach of fiduciary duty are for the jury.

The Court therefore finds that there are genuine issues of material fact as to the breach of fiduciary duty claim that should be resolved by a jury. *See Redd*, 678 F.3d at 174 ("The '[e]valuation of ambiguous acts' is a task 'for the jury,' not for the judge on summary

---

[26] John Doe Dep. Tr. 17:12–21, *supra* note 15; 20:7–10 & 21:12–22:8, *supra* note 16; Tuke Dep. Tr. 89:13–90:2, *supra* note 14.

judgment.") (citation omitted).

As a result, the motion for summary judgment should be denied as to this claim.

## IV.    CONCLUSION

For the forgoing reasons, the Court **GRANTS IN PART AND DENIES IN PART**

Hotchkiss' Motion for Summary Judgment.

Plaintiff's claim for intentional infliction of emotional distress will be dismissed, while

Plaintiff's claims of negligence, recklessness, negligent infliction of emotional distress, and

breach of fiduciary duty will proceed to trial.

**SO ORDERED** at Bridgeport, Connecticut, this 8th day of March 2019.

      /s/ Victor A. Bolden      
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE